# EXHIBIT 27



Not Reported in F.Supp.2d  
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 1

**H**  
Only the Westlaw citation is currently available.

United States District Court,  
D. Massachusetts.

COMMERCIAL UNION INSURANCE  
COMPANY and American Employers' Insurance  
Company  
Plaintiffs,  
v.  
SWISS REINSURANCE AMERICA  
CORPORATION, Defendant.

No. Civ.A. 00-12267-DPW.

March 31, 2003.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

*1 Plaintiffs Commercial Union Insurance and American Employers' Insurance Company bring this suit for payment of certain claims on a series of facultative reinsurance certificates providing excess liability coverage. The certificates were issued by defendant Swiss Reinsurance or its predecessor in interest. The plaintiffs seek money damages for breach of contract and a declaratory judgment as to the extent and nature of Swiss Reinsurance's ongoing obligations to Commercial Union under the reinsurance policies. Swiss Reinsurance has filed a counterclaim requesting a declaration that it is not obligated to make further payments to CGU under the certificates. Before me are cross motions for summary judgment.

I. BACKGROUND  
A. The Parties

Plaintiffs Commercial Union Insurance ("CGU") and American Employers Insurance Company ("AEIC"), (collectively "Plaintiffs") are Massachusetts corporations, with principal places of business in Boston. CGU is the successor in interest of Employers-Commercial Union Insurance Company ("ECGU").

The Defendant, Swiss Reinsurance ("Swiss Re"), is a New York Corporation with its principal place of business in Armonk, New York. Swiss Re is licensed by the Massachusetts Division of Insurance to transact business in the Commonwealth of Massachusetts. Swiss Re is the successor in interest to North American Reinsurance Corporation ("NA Re").

B. The Policies

Between October 20, 1962 and June 30, 1974, AEIC and ECGU, CGU's predecessor in interest, provided excess liability coverage to W.R. Grace and Co. ("Grace") (not a party to this action) in the form of four multiyear umbrella policies ("CGU policies"): Policy No. A15-2127-51 (effective 10/20/62-- 10/20/65), Policy No. A16-8220-001 (effective 10/20/65-10/20/68), Policy No. A16-8220-003 (effective 10/20/68-6/30/71), Policy No. EY-8220-005 (effective 6/30/71-6/30/74). These policies were directly excess of seven primary policies issued by the Maryland Casualty Co. ("Maryland") (not a party) between 1962 and 1973 ("Maryland policies"). Specifically, during the period October 20, 1962 through June 30, 1967, the CGU policies were excess of five primary policies issued by Maryland to Grace for one year periods. During the period June 30, 1967 to June 30, 1973, the CGU policies were excess of two primary policies each issued by Maryland to Grace for a three year period.

1. *The Underlying Policies*

The Maryland Policies [FN1] contained an endorsement titled "Three Year Policy" which stated that

FN1. From June 1973-June 1976, Continental Casualty Co. replaced

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 2

Maryland as Grace's primary insurer. Therefore, between June 30, 1973 and June 30, 1974, there was no Maryland policy underlying the CGU Umbrella policies at issue in this case. The CGU policy was excess of only the first year of the Continental Casualty policy.

A policy period of three years is comprised of three consecutive annual periods. Computation and adjustment of earned premium shall be made at the end of each annual period. Aggregate limits of liability as stated in this policy shall apply separately to each annual period.

These policies had $1 million per occurrence and aggregate limits. Maryland also issued two three-year policies to Grace (June 1967-June 1973) which were, in all material respects, similar to the one-year policies.

*2. The Excess Policies*

*2 The CGU policies were directly in excess of the Maryland primary policies and had stated limits of $5 million each occurrence and in the aggregate, excess of primary limits or "self-insured retention." Neither the declarations page nor other provisions of the CGU policies expressly state whether these per occurrence and aggregate limits apply on an annualized basis.

Two of the Policies also contain the following Endorsement:
It is agreed that the Terms and Conditions of this policy will not be construed any more restrictive than the Terms and Conditions of Underlying Insurance set forth in Item 3 of the Declarations.
Policies EY-8220-005 and A16-8220-003 state:
It is agreed that such coverage as is afforded by this policy shall apply to occurrences covered by the terms and conditions of [the underlying policy] or by the terms and conditions of this policy except that the definition of Property Damage as contained in this policy shall apply.

*3. The Reinsurance Certificates*

Between 1965 and 1971 NA Re, the predecessor in interest of Swiss Re, issued three facultative certificates of reinsurance to CGU ("Certificates"). Each of the Certificates referenced a particular CGU Umbrella Policy: Certificate No. 101085 referenced Policy No. A16-8220-001; Certificate No. 103970 referenced Policy No. A16-8220-003; Certificate No. 008091-6 referenced Policy No. EY-8220-005. The Certificates were drafted using NA Re's Certificate forms. *Id.*

The Certificates provide coverage on a "quota share basis" under which Swiss Re agreed to accept a fixed percentage of CGU's covered losses up to the reinsurance limits. [FN2] These limits were specified in Item 4 "Reinsurance Accepted" of the Certificates and varied across the policies. The policies and their limits were:

FN2. "Quota share reinsurance" is a form of "pro-rata reinsurance in which the reinsurer participates in a fixed percentage of loss." Graydon S. Staring, *Law of Reinsurance* § 2.8 (2002). By contrast, "excess of loss" reinsurance provides coverage that is not pro-rata "that commences to pay when a loss exceeds a stated or defined amount." *Id.*

*No. 101085:* "50% quota share of first $1,000,000 each occurrence"  
*No. 103970:* $250,000 each occurrence part of the first $500,000.  
*No. 0080916:* "187,500 part of first $500,000, nil of next $4,500,000."

The Certificates also contained "follow form" provisions expressed in either of the following language: "The liability of the Reinsurer specified in Item 4 of the Certificate shall follow that of the Company ..." (Certificate No. 103970, Conditions, ¶ A) or, "the liability of the Reinsurer shall follow the terms and conditions of the Company's policy furnished to the Reinsurer at the effective date of this Reinsurance Certificate, unless otherwise specifically provided herein by Endorsement made part of this Certificate" (Certificate Nos. 101085, 80916, "Application of Liability," ¶ A). The Certificates contained no other endorsements expressly defining or limiting the correspondence between the Certificates and the underlying policies. *Id.*

The Certificates also contained a "Loss Payable" provision providing that: "All claims involving this reinsurance, when settled by the Company, shall be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 3

binding of the Reinsurers, which shall be bound to pay its proportion of such settlements promptly following receipt of proof of loss." Certificate Nos. 101085, 103970, "Conditions," Loss Payable" ¶ E; Certificate No. 80916, "Loss Payable" ¶ F.

C. Factual Background
1. *The Coverage Litigation*

*3 On November 25, 1987, Grace initially filed suit against its insurers in the Massachusetts Superior Court seeking a declaration of insurance coverage for property damage arising from environmental contamination at various Grace sites across the country. Grace later amended its complaint by specifying twenty-four sites. Following Grace's amended complaint, in June 1988, Maryland filed a declaratory judgment action against Grace in the United States District Court for the Southern District of New York, which was assigned to Judge Martin, seeking clarification of its obligations under the primary policies to indemnify Grace against liability arising from pollution at nine polluted sites. *Maryland Casualty Co. v. W.R. Grace & Co.*, No. 88 Civ. 4337(JSM). Thereafter, the initial Massachusetts case was dismissed; Grace filed a third party complaint against CGU in the Southern District of New York action and hundreds of sites were added to the suit, transforming it into a comprehensive declaratory judgment action concerning the rights and obligations arising out of the multiple insurance policies. *Id.* at 4.

2. *The Insurer's Early Evaluation of Potential Liability*

During the pendency of the New York litigation, CGU engaged in frequent evaluations and discussions of its potential liability to Grace. These conversations involved CGU staff, including James J. McKay; as well as coverage counsel James Christie, and Bradley Mortensen, named partners of Christie, Parabue, Mortensen and Young, P.C., ("CPMY"); Rex Brien and Steven Urgo, attorneys at CPMY, Ann Mizner, an attorney at Kilgore, Martin & Frumer, and later, in-house counsel to CGU. Throughout these discussions, CGU staff and attorneys analyzed the state of New York law on per occurrence limits, whether the $5,000,000 policy limits would be annualized or would apply per policy, and whether these limits would be applied per site or per claim.

Of particular relevance to this case were the discussions among CGU and its attorneys over the question whether New York courts would interpret the CGU umbrella policies as providing annualized limits. In April 1995, CPMY attorney Brien drafted three memoranda for CPMY analyzing New York law on per occurrence limits for multiple year policies, "issues of critical importance to determining Commercial Union's potential exposure." Brien concluded that "New York courts would likely read the Commercial Union policies limit of liability provision as providing only one per occurrence limit for any single occurrence during the three-year policy period." In other words, according to Brien, it was unlikely that New York courts would construe the policies so as to mandate annualized limits. The distinction was of critical importance to CGU because annualized limits in a multi-year policy would mean that a separate claim could be filed for each year in which an occurrence took place, thus potentially trebling CGU's liability on a three year policy.

*4 In reaching this conclusion however, Brien expressed "concern" over the impact of an opinion from the District of New Jersey construing the "follow form" provision. *Hatco Corporation v. W.R. Grace & Co.*, 801 F.Supp. 1334 (D.N.J 1992). Brien wrote that:

Arguably, if the underlying primary policies [the Maryland policies] have annualized limits, the court could find that the per occurrence limit of liability language in the Commercial Union policies was amended to provide annualized limits, consistent with the primary policies.

Brien nevertheless concluded first, that Commercial Union could defeat this argument by contending that Grace should be estopped from arguing for annualized limits based on its litigation posture in the *Hatco* litigation, and second, that CGU could argue that *Hatco* reflected a fundamental distinction between "coverage" provisions, which would be subject to follow form rules, and limitation of liability provisions which might not. In any event, Brien concluded that CGU could expect Grace to argue for annualized limits.

On April 9, 1996, CPMY attorney Mortenson wrote a letter memorandum to Joseph Dalton, Vice President for Reinsurance at CGU, analyzing among other things, the number of occurrence limits available to W.R. Grace. Mortenson stated his

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 4

conclusion that "Grace is entitled to three annual occurrence limits" under CGU's 1962-65 and 1965-68 Umbrella policies but that Grace would not be so entitled under the 1968-71 and 1971-74 policies. Mortenson based his opinion, chiefly, on language in the 1962-65, 1965-68 CGU policies stating that the excess coverage would not be construed "any more restrictive" than the coverage in the Maryland primary policies. Because the CGU policies during this period were in excess of three separate primary policies, Mortenson concluded that the "no more restrictive" provision would operate to require annualized limits for these policies.

On the other hand, Mortenson contended that the later CGU policies contained different versions of the "no more restrictive" provision that could substantially change a court's interpretation of CGU's follow form liability. Mortenson stated:

> Whereas the previous "no more restrictive than" endorsements made the entire policy no more restrictive than the "underlying insurance," this endorsement states that the "Coverage" afforded by the policy shall apply to "occurrence" covered by the terms and conditions of the Maryland policy. We believe that this language mandates that the specific grant of coverage for occurrences ... set forth in the Maryland policy must be recognized by the Commercial Union policy even if the terms and conditions of the Commercial Union Policy would otherwise exclude coverage. However, this language only addresses *whether there is coverage* for an occurrence under the terms and conditions, not *how much coverage* is available under the terms and conditions.

Based on this analysis, Mortenson concluded that CGU policy Nos. A16-8220- 003 and EY-8220-005 would not be susceptible to an annualized limits argument.

*5 On May 3, 1996, approximately one year after the Brien memos and less than a month after the Mortenson memo, CPMY attorney Urgo wrote to Dalton and Ellen Martin, an attorney at Kilgore Martin, enclosing a copy of a recent decision by Judge Martin in a separate but related case involving Grace and Maryland Casualty ("Grace Asbestos"). *Maryland Casualty Co. v. W.R. Grace & Co.*, 88 Civ. 2613(JSM), 1996 WL 169326 (S.D.N.Y., April 10, 1996). Based on Judge Martin's decision in *Grace Asbestos,* Urgo reiterated the opinion that New York courts would probably not apply annualized limits to excess liability policies on the basis of a "follow form" argument where the excess policy is silent as to annualization.

One year later, in April 1997, CPMY attorney Christie wrote to Mizner, McKay, and Robert McCarthy of CGU expressing confidence that CGU has "the better argument" on the issue of annualization on the basis of Judge Martin's *Grace Asbestos* ruling. Moreover, Christie declared "We obviously do not believe it necessary to either settle or negotiate on the basis that these occurrence limits are annualized ..."

4. *The Grace--CGU Settlement Discussions*

Sometime in 1997, representatives of Grace and CGU began expressing interest in beginning meaningful settlement discussions. Just prior to this point, McKay was assigned responsibility as CGU's lead negotiator. Together with CPMY's Christie, McKay had earlier handled CGU's litigation strategy in the declaratory judgment proceedings. At this point however McKay apparently became more involved as settlement discussions intensified in 1997. Around this time, McKay decided to consult with CPMY's Mortenson to get from him what he anticipated would be an "objective open-minded evaluation of what the strengths and weaknesses of the case [were] notwithstanding Mr. Christie's overly optimistic and aggressive pursuit of those defenses available in litigation." Apparently, McKay and in-house counsel Mizner had become concerned that Christie's analyses of CGU's likelihood of success in the New York litigation were, as Mizner phrased it, "on a gut level out of whack" and, as McKay phrased it, "crazy in a sense, because they were just entirely overly optimistic."

McKay testified that because of his declining confidence in Christie's analysis, he "felt it would have been irresponsible for me to rely on [Christie's] positions." According to McKay, Mortenson's opinion was more reliable because it was based on "the wealth of information provided to [CGU] by Grace" once settlement discussions had begun. Mortenson himself testified that people at CGU sometimes thought that Christie "doesn't see the forest for the trees." Mizner also suggested

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 5

that she believed Christie had become "enamored of the case" and that Mortenson was brought in to provide a "neutral perspective' of their settlement negotiations.

On October 10, 1997 Mortenson and McKay met with representatives of Grace to discuss settlement of the New York action. At that meeting, the Grace representatives, including Jeff Posner, presented Mortenson and McKay with a list of 41 Grace sites for which the company claimed coverage under the policies. In addition, Grace demanded between $50-100 million to settle the case.

*6 McKay testified that he concluded, on the basis of the list of 41 sites and the fact that Grace was demanding more than $20 million in coverage, that Grace was contending that the CGU policies must be construed as offering an annualized occurrence and aggregate limit. In other words, because the CGU policies as written had an aggregate limit of $20 million, the only way Grace could have calculated a dollar amount in excess of that figure would have been by annualizing the coverage. McKay stated that he confirmed this conclusion by asking the Grace representatives how they had calculated their settlement figure, to which they "advised they had calculated on a pro rata annualized basis."

During the course of settlement negotiations, CGU and Grace agreed to focus their discussions on nine polluted sites ("Focus Sites") [FN3] so as to structure a proposed settlement. The nine Focus Sites were selected on the basis of their size and the potential exposure they presented to CGU. As part of the decision to focus the negotiation on the nine sites, Grace agreed to give CGU the information it would need to make an independent analysis of the damage and prospective remediation costs. According to testimony of Ann Mizner, McKay and Mortenson were very pleased with the first meeting with the Grace representatives particularly because they "believed it would capture or contain the liability, and it would give us a real opportunity to settle the case."

   FN3. The nine focus sites were Ft. Pierce, Florida; Nashua, New Hampshire; Memphis, Tennessee; Odessa, Texas; Walpole, Massachusetts; Acton, Massachusetts; Woburn, Massachusetts; Charleston, South Carolina and Wayne, New Jersey.

As part of the preparations for the settlement discussions with Grace, Mortenson advised CGU of his recommended coverage discounts for the Focus Sites. Mortenson testified that he prepared the coverage discounts for each site according to where he thought CGU's legal defenses were not strong.

In July 1998, CGU and Grace agreed in principle to a settlement of the New York litigation in which CGU would pay Grace $70 million over seven years for a full release of liability under all policies issued to Grace and, as well, any extra-contractual obligations CGU might have incurred during their dealings. The parties subsequently agreed to base their settlement on the present value of the payment. In October 1998, the parties entered into a settlement agreement in which CGU agreed to make a cash payment of $57.6 million.

Between October 1998 and August 19, 1999, Mortenson, McKay and Mizner engaged in the process of drafting and revising the memorandum memorializing the Grace settlement. This memorandum recounted the history of the litigation and negotiations, the theories of CGU's defenses and settlement strategies, as well as calculations of the coverage discounts that were to be applied to each of the Focus Sites in arriving at the final settlement figure. During the months between achieving the settlement and the final memorandum of that achievement, numerous editorial and substantive changes were made to the document, the bulk of them apparently by Mortenson, Mizner, and McKay.

5. *The Demand on Swiss Re*

*7 On August 20, 1999 CGU billed Swiss Re for $18,312,053 as its share of the Grace New York settlement. Included with the reinsurance tender were proofs of loss, a copy of the Settlement Agreement/ Release, and the Settlement Memorandum and Legal Analysis. In his letter accompanying the bill, McKay explained that the settlement was based on the claims regarding the nine Focus Sites, and that, the settlement was allocated among these nine sites in addition to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 6

providing CGU with a full release from claims relating to any of the non-Focus sites. Furthermore, McKay explained that CGU had calculated the value of the claims on an annualized basis with each policy providing for a one occurrence limit per year and treating each site as a separate occurrence. The liability attributable to each site was then assigned on a pro rata basis to each year of the Policies. McKay noted that

> ... some insurers may disagree with [CGU's] treatment of the occurrence issue, [but] we strongly believe that what is contained in the enclosed billing is an accurate reflection of [CGU's] underlying settlement rationale given the facts and circumstances involved with this claim, and in particular, the manuscript policy language which afforded very broad coverage to the insured.

Swiss Re apparently paid $7,794,963 on September 6 and 8, 2000, but refused to reimburse CGU for the remainder of the settlement. [FN4] It argues that CGU's billing was inappropriate because it was based on a full annualization of the claims in contravention of the single, per occurrence limits, expressed in the Facultative Certificates.

> FN4. Swiss Re Answer, Affirmative Defenses and Counterclaim, ¶ 26, Dock. No. 5; CGU Answer to Defs. Counterclaim, ¶ 26, Dock. No. 12. I note, however, that in its Rule 56.1 Statement, Swiss Re states that it had paid CGU $5,326,208 "in satisfaction of its obligations under the Certificates." Swiss Re, R. 56.1 Statement, ¶ 65, Dock. No. 34.

On November 2, 2000, CGU filed this suit against Swiss Re for damages and declaratory relief. On December 8, 2000, Swiss Re filed an answer and counter-claim for declaratory judgment, requesting a declaration that it has no obligation to pay the full amount tendered to it by CGU, or to make other payments to CGU for existing or future billings or legal expenses. [FN5]

> FN5. Swiss Re requests a declaration that CGU's submission of an annualized reinsurance tender was improper and that "CGU's remaining claim is accordingly reduced to $2,306,873." Swiss Re Motion for Partial Summary Judgment, Dock. No. 32.

II. DISCUSSION
A. Reinsurance Overview

Reinsurance is a mechanism by which an insurer spreads its risk by acquiring indemnification for loss on policies it has issued. There are two basic types of reinsurance policies: "facultative" and "treaty." Treaty reinsurance deals with specified classes of risks covered by an insurer. In other words, "treaty reinsurance involves the pooling of all policies covering a particular type of risk--such as all property damage, all liability insurance--among a group of insurers, each of whom agrees to cover a certain portion of all claims of that type." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co. Ltd.,* 9 F.Supp.2d 49, 51, n. 1 (D.Mass.1998). Facultative reinsurance, the type at issue here, involves the offer of all or a portion of the risk of a particular insured to one or more potential reinsurers, who may then accept or reject the risk in whole or part. *See Seven Provinces,* 9 F.Supp.2d at 51, n. 1; *United Fire & Casualty Co. v. Awkwright Mutual Ins. Co.,* 53 F.Supp.2d 632, 639 (S.D.N.Y.1999); *Unigard Security Insurance Co. v. North River Ins. Co.,* 4 F.3d 1049, 1053-54 (2d Cir.1993).

*8 In interpreting reinsurance contracts, the ceding company, (here CGU) has the burden of proving coverage under the Certificates. *See e.g., Commercial Union v. Seven Provinces,* 217 F.3d 33, 38 (1st Cir.2000); *Travelers Casualty and Surety Co., v. Underwriters at Lloyd's,* 724 N.Y.S.2d 1, 1 (N.Y.App.Div.2000). In this case it is undisputed that the Grace claims were covered by the policies at issue. The question here concerns the limits to that coverage.

In countering CGU's motion for summary judgment, Swiss Re argues first that its multi-year Facultative Certificates do not obligate it to indemnify CGU on an annualized basis for claims against the underlying Maryland and CGU policies, notwithstanding the fact that these underlying policies may have granted annual or annualized

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 7

coverage. Specifically, Swiss Re contends that standard "follow form" language in the Certificates does not trump the limitation of liability expressly stated in the Certificates. Second, Swiss Re argues that even if the annualization was appropriate, it should not be obligated to pay a portion of the settlement between Grace and CGU because the decision to allocate the settlement across nine sites, and the coverage discounts applied to those sites, were unreasonable. I consider each argument in turn.

B. Annualization

The question at the heart of this case--whether Swiss Re's refusal to pay CGU's claims on the Facultative Certificates issued by NA Re on an annualized basis was justified--implicates several legal issues, chiefly the construction of insurance policies and the evaluation of the degree of concurrence between primary and reinsurance policies. I consider these issues in turn. [FN6]

FN6. As the forum state for this diversity action, Massachusetts choice of law rules apply. See *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 741 F.Supp. 298, 299 (D.Mass.1990). Application of these rules suggests that either New York or Massachusetts' substantive law could govern this dispute. The First Circuit has held that where the choice of law decision will make no difference because the substantive law of the potentially applicable jurisdiction is the same, it is "unnecessary" to make a formal choice of law. See *Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir.1991); *Fashion House, Inc. v. Kmart Corp.*, 892 F.2d 1076, 1092 (1st Cir.1989). The parties to this diversity action do not present a dispute as to the choice of law to be applied here and there appears to be no difference on the relevant issues between the law of New York and that of Massachusetts. Consequently, I find it unnecessary to make a formal choice of law decision.

*1. Construction of Insurance Policies*

Construing the language of an insurance contract is a question of law for the reviewing court. *Affiliated FM Insurance Co. v. Constitution Reinsurance Co.*, 416 Mass. 839, 843 (1994); *Commercial Union Ins. Co., v. Walbrook Ins. Co., Ltd.*, 7 F.3d 1047, 1050 (1st Cir.1993). Insurance contract terms are given their ordinary meaning, based on an examination of the entire policy, including its endorsements. See *Continental Cas. Co., v. Canadian Universal Ins. Co.*, 924 F.2d 370, 374-75 (1st Cir.1991) (applying Mass. law); *Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1061 (1st Cir.1990) (applying Mass. law). An insurance contract must be interpreted as a whole to give effect to its general purpose, and with a view to effectuating the intent of the parties. See *Cullen Enter. v. Mass. Insurer's Insolvency Fund*, 399 Mass. 886, 900 n. 27 (1987); *Walbrook*, 7 F.3d at 1050. Where the words of an insurance contract are free from ambiguity the court will construe and enforce the language according to its usual and ordinary meaning. *Hakim v. Mass. Insurer's Insolvency Fund*, 424 Mass. 275, 281 (1997). Furthermore, a court must read the policy as written and is not free to revise it or change the order of words. See *Hakim*, 424 Mass. at 281. "Custom and usage may aid in policy interpretation not as tending to contradict or vary a contract but on the theory that such usage forms part of the contract." *Seven Provinces*, 9 F.Supp.2d at 66, quoting *Boston Edison Co. v. F.E.R.C.*, 856 F.2d 361, 365 (1st Cir.1988) (applying Massachusetts law).

*9 Finally, under Massachusetts law, rules of construction which protect the "reasonable expectations" of a primary insured do not apply in the reinsurance context where, it is presumed, both parties are sophisticated business enterprises familiar with the practices and forms of the reinsurance industry and are well-equipped to understand the scope of the coverage provided by the Certificates. See *Boston Ins. Co. v. Fawcett*, 357 Mass. 535, 543 (1970); *Waltham Precision Instruments, Inc. v. Federal Ins. Co.*, 1988 WL 22499 (D.Mass.1988)(applying Massachusetts law); *Ruthardt v. Underwriters at Lloyd's London*, Mass.Super. Ct., Civ. Act. No. 91-7877C. at 11-12.

The proper starting point for an analysis of the meaning of the policies is with the text of the policies. As noted above, the Swiss Re policies contain "follow form" provisions which state: "The liability of the Reinsurer specified in Item 4 of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d  
(Cite as: 2003 WL 1786863 (D.Mass.)) 

Page 8

Certificate shall follow that of the Company and, except as otherwise provided specifically herein, shall be subject in all respects to the terms and conditions of [CGU's] policy" or "the liability of the Reinsurer shall follow the terms and conditions of the Company's policy ... unless otherwise specifically provided herein by Endorsement made part of this Certificate. "Item 4" of Certificate No. 103970, as referenced by the first follow form provision, states the "Reinsurance Accepted" under the policy and provides: "$250,000 each occurrence part of the first $500,000." In respect to the terms of the second provision, the Certificates contained no other endorsements "specifically" defining or limiting the concurrence of the Certificates to the underlying policies.

At the outset, I must determine whether the Certificates are ambiguous. At first glance, the follow form provisions contained in the Application of Liability may seem ambiguous in providing that Swiss Re's liability shall follow the "terms and conditions" of the ceding insurer; as the instant controversy makes clear, the phrase "terms and conditions" is perhaps subject to two reasonable, but conflicting, interpretations.

Read in the broadest possible way, "terms and conditions" could encompass the entire underlying policy, including its coverage definitions, exclusions, endorsements, and limits of liability. That is essentially the reading advanced by CGU.

For its part, Swiss Re contends that "terms and conditions" should be read narrowly to refer to those provisions establishing the type of coverage in the underlying policy, but does not extend to the limits of liability set forth in the reinsurance Certificates. According to Swiss Re, following the "terms and conditions" of the underlying policy obligates Swiss Re to indemnify CGU for losses from occurrences as defined in the underlying policies but does not operate to cause Swiss Re to exceed its bargained for limits of liability as those limits are expressed in the Certificates.

*10 While it may be true that "terms and conditions" taken out of context is arguably vague, construing this provision in light of the Certificates as a whole, as I must, and in light of recent decisions discussing the effect of follow form provisions, I find that the Certificates set forth unambiguous limits to Swiss Re's liability to CGU. I find the question of annualization to be one of limits. And I conclude the clear language of the Certificates does not permit the imposition of annualized limits on Swiss Re in excess of the stated per occurrence and aggregate limits.

I find that any arguable ambiguity of the follow form provision in the Certificates is clarified by the operation of the express liability limits of the Certificates, as set forth in Items 2 and 4 of the policies. The "Application of Liability" provisions, stated in Certificates 101085 and 80916 covering CGU policies for 1965-68 and 1971-74 respectively, make clear that the follow form provision is subject to specific provisions of the Certificates.

CGU contends that, given the "by endorsement made part of this Certificate" language of Certificates No. 101085 and No. 80916, the fact that the Certificates contain no such endorsements expressly limiting Swiss Re's obligation to follow form with CGU demonstrates that the limits of liability are controlled by the follow form provisions. According to CGU, the absence of any limiting endorsements means that Swiss Re must follow form of the terms and conditions of the underlying policies, such that Swiss Re must annualize its coverage as CGU has done.

Based on an evaluation of the Certificates as a whole, I find that this argument mistakes the import both of the phrase "by endorsement made part of this certificate" as well as the limitations of liability set forth on the face page of the Certificates. The fact that no endorsement exists altering or amending the terms of the policy does not mean that the Certificate provided no limits whatsoever to Swiss Re's liability to CGU. The crucial terms of a reinsurance contract, namely the policy period, per occurrence and aggregate limits, as well as the premium to be charged, are not generally expressed in the form of endorsements but rather on the face page of the reinsurance certificates themselves. The Certificates in dispute here clearly identify that the coverage provided by the reinsurance covers three year policy periods: 1962-65, 1968-71, and 1971-74. Similarly, the Certificates identify the per occurrence and aggregate limits of coverage afforded by the reinsurance. These crucial terms exist prior to any endorsement and form the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

framework to which any future endorsements would attach. In other words, the mere fact that endorsements were not added to the policy is irrelevant to the existence, and preeminence, of the stated policy term and limits of liability. Thus, while not an "endorsement made part of this certificate" per se, the limitations of liability set forth in the declarations page nonetheless constitute specific terms that govern the amount of indemnification available under the policy. In this respect, the primary import of the phrase "endorsement made part of the Certificate" is to require that any adjustments or alterations to the reinsurance coverage within this framework be expressed and incorporated in the policy. In the case of the per occurrence and aggregate limitations of liability, there is no doubt that such a term is part of, if not essential to, the policy and reflects the coverage and premium which NA Re and CGU actually bargained for.

*11 The limitations of liability and policy period expressed on the face page of the Certificates are unambiguous. The reinsurance certificates cover three year terms. "Item 4" in the certificates, defining the "Reinsurance Accepted" under the policies, specifies the level of indemnification offered. For example, Certificate 101085 states that the reinsurer accepts "50% Quota Share part of first $1,000,000 each occurrence" of CGU's umbrella liability. Item 4 of Certificate 103970 provides "$250,000 each occurrence part of the first $500,000." Finally, Item 4 of Certificate 80916 provides $187,500 part of first $500,000. Each of these Certificates provides clear and unambiguous limits on the indemnification afforded by the reinsurance during the three year policy term. There is nothing in the Certificates to suggest that the coverage was understood to apply on an annual basis, rather than on the three year policy term defined by the Certificates. As a consequence, I find that the language of the Certificates read as a whole is not ambiguous as to the annualization issue.

*2. Effect of Follow Form Provisions*

Having concluded that the Certificates are not ambiguous, I must next consider the separate question of the potential conflict between the follow form and limitation of liability provisions. CGU argues that, in the absence of express endorsements limiting Swiss Re's obligation to follow form with the CGU and Maryland policies, the follow form provision of the policy must prevail over the stated limits of liability. Swiss Re counters that the limits of liability, reflecting as they do the particular agreement of the parties, must trump the standard, pre-printed follow form language contained in the "Conditions" section of the Certificates.

Where there is a conflict between written or typewritten terms and standard or form language in an insurance contract, the written or typewritten language prevails. *See e.g., N.Y. Marine & Gen. Ins. Co. v. Tradeline,* 266 F.3d 112, 124 (2d Cir.2001); *Bluewaters, Inc. v. Boag,* 320 F.2d 833, 835 n. 4 (1st Cir.1963) ("that typewritten additions normally prevail if there is a conflict with printed provisions is well established"); *Plymouth Rubber Co., Inc. v. Ins. Co. of North Am.,* 18 Mass.App.Ct. 364, 366 (1984). Indeed, the force of the limitations of liability as a specific, bargained for term, decisively outweighs the boilerplate follow form provisions which CGU claims are controlling here. *See id.* As one leading treatise has stated the rule: "If the printed and written clauses are repugnant to each other and cannot be reconciled, the written part, having been especially chosen for the occasion to express the agreement of the parties, will be given effect." *See 2 Couch on Insurance* § 22:3 (3d ed.1997). In light of this well established rule, I conclude that the limitations of liability, being provisions drafted specifically to govern the relationship between CGU and NA Re regarding the cession of some portion of CGU's liability, may not be overwritten by the operation of standard follow form language in the certificates. *See id.*

*12 Courts analyzing similar policy language have concluded that stated limits of liability control standard follow form provisions. *See e.g., CSX Transportation v. Commercial Union Ins. Co.,* 82 F.3d 478, 483 (D.C.Cir.1996); *Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles Inc., v. Interstate Fire & Cas. Co.,* ("Society I"), 26 F.3d 1359, 1366 (5th Cir.1994) (fact that three year occurrence policy provides less coverage than three one-year policies did not justify providing more insurance coverage than the insured bargained for); *Unigard,* 4 F.3d at 1071; *Bellefonte v. Reins. Co. v. Aetna Cas. and Sur. Co.,* 903 F.2d 910, 913 (2d. Cir.1990); *Calvert Fire Ins. Co. v. Yosemite Ins. Co.,* 573 F.Supp. 27, 29 (E.D.N.C.1983) (reinsurer's liability followed the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 10

fortunes of ceding insurer only within limits specified in reinsurance certificates); *Diamond Shamrock Chemicals Co. v. Aetna Cas. and Sur. Co.,* 258 N.J.Super. 167, 224-25 (1992) (limit of liability in excess policies does not follow form but was fixed per occurrence, notwithstanding fact that primary policies contained annualized limits).

The decision of the Second Circuit in *Unigard,* following its *Bellefonte* holding, is particularly relevant. The court in *Unigard* faced a similar argument to that advanced by CGU, namely that the follow form provision in certain multiyear reinsurance certificates required the reinsurer to pay sums in excess of the certificate's stated limits. *See id.* at 1070. The *Unigard* Court noted first that the Certificate in controversy provided policy limits. *See id.* at 1071. Next, reiterating the logic of *Bellefonte,* the court stated that the limitation on liability capped the reinsurer's liability under the certificate and that "all other contractual language must be construed in light of that cap." *See id., quoting Bellefonte,* 903 F.2d at 914. The court then concluded that the fact that the ceding insurer had been compelled to pay certain disputed expenses by binding arbitration could not alter the bargained for terms of the agreement as expressed in the limitations of liability. *See id.*

Where, as here, the stated limits of liability are clear and unambiguous, judicial interpolation of the word "annual" into the express language of the certificates would be inappropriate. *See e.g., Grace Asbestos,* 1996 WL 169326, at *5; *CSX,* 82 F.3d at 483; *Society I,* 26 F.3d at 1366. There is no language in the Certificates remotely suggesting that "each occurrence" should be read as "each occurrence each year." *See CSX,* 82 F.3d at 483. Imposing such a term would fundamentally re-write the coverage afforded by the policy by making Swiss Re liable for up to three times its express and bargained-for liability under the Certificate. *See Society,* 26 F.3d at 1366.

The conclusion that follow form provisions may not, in cases of alleged ambiguity, be used to supplant express liability caps is supported by case law from numerous jurisdictions which has held that "follow form" provisions are intended primarily to forestall, if not prevent, litigation between ceding insurers and reinsurers over the whether a claim is "of a type" covered by the primary insurance. *See e.g., Christiana Gen. Ins. Corp., v. Great Am. Ins. Co.,* 979 F.2d 268, 280 (2d. Cir.1992) (reinsurer liable for risks encompassed by underlying policy, not for payments clearly beyond the scope of underlying policy or in excess of its agreed to exposure); *United Fire,* 53 F.Supp.2d at 641-42 (follow form provision in reinsurance certificate does not require inclusion of earthquake protection insurance as "term and condition" of business interruption insurance); *Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1355, 1357 (D.N.J.1992) (pollution exclusion in reinsurance policy gives way to coverage afforded by underlying policy due to following form provision, unless expressly excluded by reinsurance); *State Automobile Mut. Ins. Co. v. American Re-Insurance Co.,* 748 F.Supp. 556, 561 (S.D.Oh.1990) (follow the fortunes clause in reinsurance agreement means that "reinsurer is only liable for the loss *of the kind* reinsured") (emphasis added); 13A J. Appelman and J. Appelman, Insurance Law and Practice, § 7698 at 556 (1976) ("despite a 'follow the fortunes clause', the reinsurer is only liable for a loss *of the kind* reinsured") (emphasis added).

*13 As the court in *Aetna Casualty. and Surety v. Home Insurance Co.,* stated: "the purpose of following form is to achieve concurrence between the reinsured contract and the policy of reinsurance, thereby assuring the ceding company, that by purchasing reinsurance, it has *covered the same risks* by reinsurance that it has undertaken on behalf of the original insured under its own policy." 882 F.Supp. 1328, 1345 (S.D.N.Y.1995) (emphasis supplied). The goal of follow form provisions is to assure the ceding insurer that the purchased reinsurance will cover the same "occurrences" as provided by its underlying policies. *See id.* The case law establishes that follow form provisions like those at issue here prevent a reinsurer from contesting the decision of an underlying insurer to cover a claim, not from denying to indemnify the ceding insurer for sums in excess of its limits of liability. *See Christiana,* 979 F.2d at 280; *State Automobile,* 748 F.Supp. at 561; *United Fire,* 53 F.Supp.2d at 641-42; *Hatco,* 801 F.Supp. at 1355, 1357.

Of course, the question here is more narrowly whether Swiss Re is obligated to follow form with CGU's payment of claims validly within its coverage calculated on an annualized basis. CGU

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 11

argues that even if the limitations of liability set forth in Item 4 of the facing page of the Certificates do limit Swiss Re's per occurrence liability, Item 4 does not specify the application of that liability. Thus, CGU contends, according to the Application of Liability provision of the Certificates, Swiss Re must "follow form" and provide annualized limits.

In support of its argument that the follow form provisions in this case, in combination with the no more restrictive clauses of its policies, required CGU to annualize Grace's claims against it, and therefore CGU's tender to Swiss Re, CGU cites *Hatco Corporation v. W.R. Grace and Company,* 801 F.Supp. at 1335-37.

*Hatco* involved an earlier chapter in the litigation of the many insurance claims arising out of Grace's pollution of hundreds of sites across the country. *Id.* at 1333. One of the central issues in *Hatco* was whether "gradual pollution" was an "occurrence" as that term was defined within the primary and excess insurance Grace had purchased. *Id.* at 1343. For present purposes, CGU cites to *Hatco* for the proposition that "follow form" provisions in the excess umbrella policies issued to Grace must be read so as to allow coverage for the gradual pollution claims where the excess policies did not expressly exclude coverage. *Id.* at 1348, 1353-1355.

Significantly, the policies at issue in *Hatco* contained the same follow form provision that may be found in two of the three disputed policies here. *Id.* at 1355. Specifically, the policy stated:

> it is agreed that such coverage as is afforded by this policy shall apply to occurrences covered by the terms and conditions of Maryland Casualty Company ... or by the terms and conditions of this policy except that the definitions of Property Damage as contained in this policy shall apply.

*14 *Id.* at 1355. Based on this provision in the excess policy, Grace argued in *Hatco* that the excess policy effectively incorporated the gradual pollution coverage provided by the underlying policy in spite of its exclusion from the reinsurance policies. *Id.* In particular, Grace asserted that the phrase "such coverage as is afforded" referred only to "the dollar amount thresholds to trigger excess coverage and the *maximum policy limits*" but did not otherwise exclude types of coverage afforded by the underlying policy. *Id.* (emphasis supplied). The Insurers countered that coverage under the excess policies for occurrences covered by the Maryland primary policies was afforded only to the extent that such coverage was consistent with the terms of the excess policies. *Id.*

Finding for Grace, the court in *Hatco* held that the following form provision in dispute was ambiguous in that it was susceptible to either of the interpretations offered by the parties. *Id.* The *Hatco* court determined that the lack of clarity in the follow form provision must be construed against the drafter, in that case, the excess insurers. *Id.* The effect of this determination was to "delete the pollution exclusion in the excess policies to the extent it was inconsistent with the coverage provided by the primary policy." 801 F.Supp. at 1355. Thus in analyzing "no more restrictive" provisions in the underlying policies that are identical to those disputed here, the *Hatco* held that unless the excess policies expressly exclude coverage for a particular occurrence, the "no more restrictive" provision operates to mandate concurrence of coverage between the primary and excess policies. *Id.* at 1357-58.

*Hatco* turns on the difference between "coverage" provisions and limitations of liability. *See id.* at 1353-56. It stands for the proposition that, absent express exclusions for types of occurrences, follow form provisions will require concurrence of coverage between excess and primary policies. *See id.* The court stated that the provisions at issue "merely set lower policy coverage limits for property damage resulting from gradual pollution than is provided under the general policy limits for property damage." *Id.* The effect of this distinction for the parties here is significant because it casts the result of *Hatco* not simply as a broad authorization of follow form provisions but locates the analysis in a narrower field of inquiry covering the difference between coverage and limitation of liability provisions. *See id.* In other words, *Hatco* is consistent with those cases holding that follow form provisions will assure concurrence of coverage unless the type of risk is expressly excluded. *See CSX,* 82 F.3d at 483; *Unigard,* 4 F.3d at 1070-71; *Bellefonte,* 903 F.2d at 913; *Calvert,* 573 F.Supp. at 29. *Hatco* does not purport to erode the distinction between coverage issues and liability limits.

*15 CGU also cites to a pair of decisions in this circuit, *Seven Provinces,* 9 F.Supp.2d at 66-67

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 12

(D.Mass.1998) and *Commercial Union Ins. Co. v. Seven Provinces,* 217 F.3d 33 (1st Cir.2000), in support of its follow form argument. In *Seven Provinces,* the District Court held, among other things, that the follow the settlements doctrine, a variant of the follow form principle, required that the reinsurer pay its portion of the insured's settlement of protracted environmental litigation. 9 F.Supp.2d at 66-67. Moreover, the court held that the follow the settlements rule covered the reinsured's coverage determinations and its allocation of the litigation settlement across policies. *Id.*

These holdings do affirm that the follow the fortunes doctrine creates a powerful presumption that settlements made by a reinsured will be sustained, barring evidence of bad-faith, collusion or fraud. *Id.* Nevertheless, I find that while instructive for defining the burdens of the parties in these kinds of disputes and the viability of settlement allocations, the *Seven Provinces* holdings do not clarify the threshold question in this case, namely whether the follow form provisions in the Certificates may be read to require the reinsurer to pay for claims that exceed the stated limitation of coverage.

I find the reasoning of the Second Circuit in *Bellefonte,* and *Unigard* and the Southern District in *United Fire* most persuasive on the threshold issue. Together these cases stand for the rule that, notwithstanding the importance of enabling concurrence between primary and excess policies, follow form provisions should not be read to erase the limitations of liability set out in a reinsurance certificate. *See Unigard,* 4 F.3d at 1070-71; *Bellefonte,* 903 F.2d at 913 (follow the fortunes provisions meant to "coexist with" not supplant liability caps in certificates); *United Fire,* 53 F.Supp.2d. at 641-42; *see also, Grace Asbestos,* 1996 WL 169326 at *3-4. As Judge Martin, the presiding judge in the underlying policy dispute from which the instant case springs, observed in *Grace Asbestos,* "while the [reinsurance] policies follow form to the underlying insurance in some respects, this does not include limits of liability ..." *Grace Asbestos,* 1996 WL 169326 at *3.

In this respect, the limitation of liability set out in Item 4 of the Certificates must be recognized as an express statement of the terms and conditions of the policy sufficient to resolve an apparent ambiguity regarding the coverage. *See Grace Asbestos,* 1996 WL 169326 at *3; *Unigard,* 4 F.3d at 1071, *Bellefonte,* 903 F.2d at 913. Therefore, I conclude that the follow form provisions and no more restrictive endorsements may not be read through the unexpressed vehicle of annualization to increase Swiss Re's aggregate liability beyond that stated in the limitations of liability of each Certificate. *See id.*

*16 Recent case law on the issue of annualization also supports a conclusion that annualized limits should not be read into multi-year reinsurance policies, absent an express statement that the policy coverage is to be calculated on an annual basis. *See e.g., Society I,* 26 F.3d at 1365-66; *Diamond Shamrock,* 258 N.J.Super. at 223-25; *Hercules, Inc., v. Aetna Cas. & Sur. Co.,* 1998 WL 962089 *5-6 (Del.Super.Ct. Sept. 30, 1998); *General Refractories Co. v. Allstate Ins. Co.,* 1994 WL 246274 *1, *3 (E.D.Pa. June 8 1994); *see also,* Paris, "Reinsurance Issues", 6 Massachusetts Liability Insurance Manual § 6.5- § 6.7, Massachusetts Continuing Legal Education (2000); Chanes, "Once is Never Enough," Mealey's Litigation Report: Insurance, Vol. 14, Issue 27 (May 16, 2000) at 1-8. Much of the recent litigation has arisen in the area of mass tort and environmental pollution litigation and concerns how an underlying insurer determines the number of occurrences under its policy. *See* Paris at § 6.7.2; Chanes, at 2.

*Society I* concerned the interplay of two three year primary policies and two multi-year excess policies in providing coverage for the policyholder in the wake of liability claims stemming from years of child abuse by the policyholder's employees. 26 F.3d at 1362. The trial judge had determined that coverage under the primary policies was triggered at the time each child was molested during a policy period; all subsequent incidents involving the same child were considered "repeated exposure to the same conditions" and were therefore part of the same occurrence. *See id.* at 1366. The *Society 1* court then rejected the excess insurer's argument that the primary policies must be annualized, holding that, absent an express annualization clause, multi-year insurance policies would not be annualized. *See id.; see also, Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.,* 126 F.3d 727, 742 (5th

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Cir.1997) ("Society II").

Although *Society I* concerned the annualization of primary policy limits, other courts have applied the same reasoning to cases involving the annualization of limits in excess policies. *See e.g., Diamond Shamrock,* 258 N.J.Super. at 223-25 (absence of annual definition in multiyear excess policies precludes annualization of excess policy limits); *General Refractories,* 1994 WL 246274 at *3; *but see Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 978 F.Supp. 589, 607-08 (D.N.J.1997) *rev'd on other grounds by Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co.,* 177 F.3d 210 (3d. Cir.1999).

To summarize, I conclude that Swiss Re was not obligated to annualize the limits of liability as stated in the Facultative Certificates at issue here. These limits stand as the ceiling of Swiss Re's liability to CGU during the three year policy period. The "follow form" provisions of the Certificates, while assuring concurrence of coverage, may not be used to increase the reinsurer's unambiguous, bargained-for limits of liability as stated in the Certificates. Summary judgment for Swiss Re is therefore appropriate and a declaratory judgment will enter in favor of Swiss Re.

C. Allocation of Settlement

*17 Because I have determined that Swiss Re was not required to indemnify CGU in excess of the limits of liability stated in the reinsurance certificates, I conclude that Swiss Re is only obligated to "follow the fortunes" of CGU's settlement with Grace up to the per occurrence limit specified in the Certificates. *See Unigard,* 4 F.3d at 581 (under follow the fortunes doctrine, reinsurer is required to indemnify for payments reasonably within the terms of reinsurance policy); *Christiana,* 979 F.2d at 280; *Ruthardt,* slip. op. at 17-18 (follow the fortunes doctrine not relevant where reinsurer denied payment based on express terms of reinsurance policies). "The follow the fortunes doctrine is not intended to supplant other provisions of the reinsurance treaties." *Ruthardt,* at 17-18.

Swiss Re's challenge to the Grace settlement and site allocation formula employed by CGU was, as argued in its summary judgment briefs, concerned with the propriety of the annualization decision. Because Swiss Re has posed no independent challenge in its briefing to the legitimacy of the overall Grace settlement, I need not consider further CGU's follow the fortunes argument.

III. CONCLUSION

For the reasons stated above, CGU's motion for summary judgment is DENIED; and Swiss Re's motion for partial summary judgment is GRANTED.

I am prepared to direct the clerk to enter a declaration in favor of Swiss Re, to the effect that CGU's submission of its Reinsurance Tender on an annualized basis was improper as a matter of law and that Swiss Re has no obligation to make payments on that basis. Nevertheless, no doubt because the practical impact as to particular claims for payments was not the focus of the parties' summary judgment briefing and because my own calculations of what I understand to be the relevant arithmetic seems inconsistent, I am hesitant to craft a declaration without additional assistance from the parties in identifying what further action is necessary to bring this case to final judgment. Accordingly, the parties are directed to confer and submit on or before April 15, 2003, jointly if they can, separately if they must, a proposal for reducing this case to final judgment on the basis of this Memorandum, including a proposed form of declaratory judgment identifying what additional financial obligations of Swiss Re, if any, remain to be resolved in accordance with this Memorandum.

2003 WL 1786863 (D.Mass.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works